IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TORRENCE S. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 11 C 2477 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| PATRICK R. DONAHOE, Postmaster | ) | |
| General, United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Williams sued the United States Postal Service ("USPS") for race discrimination and retaliation. The USPS moves for summary judgment on all claims. For the reasons stated below, the motion for summary judgment is granted.

**I.      Facts**

Before detailing the facts of the case, the Court notes that Williams failed to fully comply with Local Rule 56.1. While the defendant sent Williams the notice to *pro se* litigants prescribed by Local Rule 56.2, he failed to properly respond to the defendant's statement of material facts. Williams denies certain statements of fact but sometimes fails to cite to the record or cites generally to various exhibits and attachments without identifying a specific page number. Moreover, some of Williams' citations to the record simply do not support the denial. The Court's job was also made more difficult by the fact that not all of the exhibits that Williams submitted in support of his denials or additional statements of fact are marked, those that are marked are in random order with different numbering systems, and he provides no index of the exhibits he filed. The Court appreciates that Williams is proceeding *pro se*. Nevertheless, *pro se* litigants must abide by the same rules as litigants who are represented by counsel. *Pearle Vision,*

*Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (*pro se* litigants are not "excused from compliance with procedural rules").

Accordingly, to the extent that any of Williams' denials do not contain a citation to the record, the citation does not support the denial, or the Court was simply unable to locate the exhibit that Williams refers to, those statements of fact by the defendant have been deemed admitted. *See* Local Rule 56.1(b)(3) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *see also U.S. v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010) ("At summary judgment . . . saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it [is] not the district court's job to sift through the record and make [the party's] case for him.").

*Data Collection Technician Positions*

Williams, who is African American, began working for the USPS as a full-time laborer custodian at the Airport Mail Center O'Hare ("AMC O'Hare") facility on December 24, 2005. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt., Dkt. # 69, ¶ 1.)  A January 2010 notice by the USPS solicited applications for three available openings for the position of data collection technician. (*Id*. ¶ 2.)  Each position had a unique job number and applicants were required to complete a PS Form 991, Application for Promotion or Assignment. (*Id*. ¶ 4.)  Valitta Hunter and Mamie Averhart, both African-American females, were responsible for selecting applicants for the data collection technician positions. (*Id*. ¶ 5.)  Of the eighteen data collection technicians who report to Hunter, fourteen are black, three are Hispanic, and one is Asian American. (*Id*. ¶ 6.)  Hunter and Averhart made their selections based on a review of the application, attendance history,

accident history, and Employee Key Indicator Report ("Employee Report") for each applicant. (*Id.* ¶ 7.) While Williams submitted an application, it did not specify which vacancy he was seeking and provided incomplete reference information. (*Id.* ¶¶ 8-9.) In addition, Williams' Employee Report showed that, between February 1, 2005 and February 4, 2010, he was late to work 31 times, he was issued a warning for failure to maintain regular attendance, and he was suspended 7 days for failure to follow instructions and 14 days for failure to maintain regular attendance. (*Id.* ¶ 10.) Hunter and Averhart did not select Williams for the data collection technician positions because he did not specify a job identification number on his application, his qualifications were not as strong as the other applicants, he provided incomplete reference information on his application, and his Employee Report indicated that he had received prior disciplinary action for attendance and failure to follow instructions. (*Id.* ¶ 11.) Hunter and Averhart attest that race was not a factor in their decision not to hire Williams. (*Id.* ¶ 12.) Williams was one of 14 applicants for the data collection technician positions who was not selected. (*Id.* ¶ 13.)

Noel Garcia and Edward Sanchez were selected for two of the positions and the third opening was not filled at that time. (*Id.* ¶ 15.) Hunter and Averhart chose Sanchez and Garcia because they specified the job identification number, their qualifications were strong, they provided complete reference information and their Employee Reports showed no discipline for attendance or work performance. (*Id.* ¶ 17.) In addition, their applications reflected significant experience in tasks related to the data collection technician position. (*Id.*) When the third unfilled position was re-posted, Williams applied but again, no one was selected for the position. (*Id.* ¶¶ 22-24.)

*Reassignment*

On June 23, 2010, the USPS sent a letter to employees at the AMC O'Hare facility, including Williams, advising them of the upcoming closing of the facility and the possibility of an involuntary reassignment. (*Id.* ¶ 27.) In response to the letter, Williams requested various laborer custodial positions in and around Chicago. (*Id.* ¶ 28.) On August 9, 2010, Williams was notified that he was reassigned to the Kansas City, Missouri Processing & Distribution Center ("Kansas City P&DC") as a full-time laborer custodian effective September 11, 2010. (*Id.* ¶ 29.)

Reassignments were based on seniority. (*Id.* ¶ 33.)[1] Eighteen laborer custodians from the AMC O'Hare facility who were reassigned in and around Chicago had more seniority in terms of years of service than Williams. (*Id.* ¶¶ 36, 37.) On August 24, 2010, Williams wrote a letter to Gloria Tyson, District Manager, stating that he believed that the reassignment discriminated against veterans and that he would not relocate to Kansas City. (*Id.* ¶ 39.) Tyson responded in a September 20, 2010 letter in which she indicated that the reassignments were based on the language of the collective bargaining agreement, postal rules and regulations and applicable laws including the Veterans Preference Act. (*Id.* ¶ 40.)

Effective September 11, 2010, Williams was reassigned to the Kansas City PD&C as a full-time laborer custodian (*Id.* ¶ 41.) Having not reported to work at the Kansas City PD&C, Williams was instructed in a September 30, 2010 letter to report to work or submit satisfactory documentation explaining his failure to report for duty. (*Id.* ¶ 42.) In an October 7, 2010 letter,

---

[1] Williams denies this statement of fact stating that "[t]he plaintiff acknowlegde[s] only in total years of postal service, NOT according to JCIM Article 12 regarding reassignments. FURTHERMORE, JCIM GOVERNS ALL NATIONAL AGREEMENT ISSUES (*See* Document 003736-003737, 003760-61; Nalaski Affidavit No. 2)." (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. 69, ¶ 33.) While Williams does not state what JCIM stands for, the Court's review of the referenced affidavit of Robert Nalaski indicates that JCIM stands for the USPS/APWU Joint Contract Interpretational Manual. However, the Court was unable to locate the bates-stamped pages to which Williams cites.

Williams wrote to the human resources department at the Kansas City facility that he was not accepting the "involuntary reassignment." (*Id*. ¶ 43.) Williams never reported to work in Kansas City. (*Id*. ¶ 44.)

On March 16, 2010, Williams filled out a form entitled "Information for Pre-Complaint Counseling" with the Equal Employment Investigative Services Office of the USPS alleging discrimination based on race and sex as well as his veteran status with respect to his not being selected for the data collection technician positions. (*Id*. ¶ 49.) On May 14, 2010, Williams was issued a Notice of Right to File Individual Complaint. (*Id*. ¶ 50.) In his formal complaint of discrimination with the EEOC, received on June 1, 2010, Williams checked the boxes for race, sex and retaliation. (*Id*. ¶ 51.) On June 7, 2010, the EEO office of the USPS issued a partial acceptance/partial dismissal of Williams' EEO complaint, accepting the allegation of race and sex discrimination with respect to one of the data collection technician positions, but dismissing the other because a selection was not made for that position. (*Id.* ¶ 53.) A footnote in the letter also indicated that because Williams had failed to support his claim of retaliation in his charge, it was not being investigated. (*Id*. ¶ 54.)

On January 13, 2011, the administrative law judge ("ALJ") who heard Williams' race and sex discrimination complaint granted the USPS' motion for summary disposition and dismissed Williams' complaint with prejudice. (*Id*. ¶ 55.) The EEO office of the USPS issued a Notice of Final Action on May 25, 2010, implementing the decision of the ALJ and notifying Williams of his right to appeal to the director of the EEOC or file a civil action in the appropriate United States District Court. (*Id*. ¶ 57.) On April 13, 2011, Williams filed the instant action.

According to a October 27, 2010 letter from Maurice Kemp, President of Local 7011, to Williams, a union grievance was filed on Williams' behalf on June 1, 2010. According to the

5

letter,

> [i]t has been determined by the union that since the AMC O'Hare facility was closing Mr. Williams . . . [was] to be excessed to the Kansas City, Mo. PD&C by Sept. 11, 2010. In regards to the closing, there were no promotions available in this facility. Therefore the union did not pursue with [sic] this grievance any further.
>
> Mr. Torrence Williams you chose not to take the new assignment in Kansas City, Mo. PD&C and [are] now separated from the United States Postal Service. Therefore you have no opportunity for a promotion at that facility either. The AMC O'Hare facility is now closed and there is no merit for a grievance for promotions.

(*Id.* ¶ 62; Def.'s Ex. 30, 10/27/2010 letter from Kemp to Williams.)

## II. Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). At the summary judgment stage, we "do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Normally, all evidence and reasonable inferences are construed in favor of the non-moving party to determine if there is a genuine issue of material fact. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005).

## III. Analysis

### A. Failure to Promote

Williams alleges that he was discriminated against when he was not hired for the three different openings for the position of data collection technician. While Williams may attempt to prove his Title VII claim under the direct or indirect methods, *Atanus*, 520 F.3d at 671, he proceeds only under the indirect burden-shifting method with respect to his race discrimination

6

claim. In order to make a prima facie showing of discrimination in a failure to promote case, the plaintiff must demonstrate that "(1) he was a member of a protected group; (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) those who were promoted had similar or lesser qualifications for the job." *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1090–91 (7th Cir. 1999). "If the plaintiff succeeds in establishing a prima facie case of discrimination, the burden then shifts to the defendant, who must explain why it failed to promote the plaintiff." *Id*. "If the defendant provides reasons that are nondiscriminatory on their face, the burden returns to the plaintiff who then must demonstrate that defendant's proffered reasons are pretextual." *Id*.

"The prima facie case and pretext inquiries often overlap; [a court] may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). Even assuming that Williams has met the requirements of a prima facie case for all three data collection technician positions, he cannot show pretext. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (internal quotes omitted). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Here, the defendant contends that Williams was not hired because his application did not specify which of the three data collection technician positions he was seeking and also did not provide complete reference information. Moreover, the defendant asserts that Sanchez and Garcia were hired instead of Williams because they had better attendance records and experience.

7

Williams first claims that these reasons are pretextual because Veronica Flores, the supervisor of the two women, Hunter and Averhart, who filled the data collection technician positions, "took no action" with respect to purported violations the women made in selecting Sanchez and Garcia. But, the defendant stated in answers to interrogatories that Flores did not have direct supervision or oversight on how the data collection technician positions were staffed. (Def.'s Resp. Pl.'s First Set Int., Dkt. # 69-24, page 2 of 19, Int. No. 1.) Moreover, Williams fails to state how Flores' purported failure to discipline Hunter and Averhart demonstrates that the reason they chose Sanchez and Garcia instead of Williams was pretextual. Williams next asserts that the reason provided as to why he was not hired was pretextual because he heard that Hunter initially sought to fill the final data collection technician position with an Asian man who had similar disciplinary and attendance issues as Williams. But, the plaintiff's affidavit, which purportedly supports what he heard (Dkt. # 69-23, page 16 of 19, ¶ 2) is based on hearsay and, in any event, this Asian man was, according to Williams, eventually not hired. (*Id*.)

In addition, Williams asserts that Hunter and Averhart's reasons for not hiring him are pretextual because Hunter told him he was not considered for the data collection technician position because he was a labor custodian. Williams appears to argue that because labor custodians are predominantly African American, the defendant's failure to hire labor custodians as data collection technicians perpetuates a culture of discrimination and therefore the reason the defendant gave for not hiring him is pretextual. In support, he asserts that "USPS allowed white and Hispanic clerks (6) to be placed into custodian jobs while plaintiff was one of almost 90 % (22/25) African American custodians who entered the USPS as a custodian." (Pl.'s Resp., Dkt. # 68, at 7.) Williams also asserts that "USPS had no selection rate for plaintiff for [data collection technician] positions (0/3) or any clerk positions despite job related skills." (*Id*.) The plaintiff,

8

however, fails to put the numbers in context and does not identify any relevant dates or geographical boundaries associated with the data. Moreover, the evidentiary support for the statements lacks foundation. Williams refers to the affidavit of Robert Nalaski, who was a Vice-President of the American Postal Workers Union Local 7011 from 1997 to 2000, as the basis for the aforementioned statistics, but the affidavit contains no statement as to the source of the numbers or that Nalaski, as the Local 7011 Vice-President from 1997 to 2000, had personal knowledge of statistics that could be relevant to Williams' 2010 failure to promote claim.

Finally, the Court notes that Williams contends that due to grievance settlements with the USPS, he ultimately received less or no discipline for his late arrivals and absences than what was reflected in his Employee Report. Even assuming this is true, Hunter and Averhart also considered Williams' lack of relevant experience, his failure to identify the position number for which he was applying and his incomplete reference in deciding not to hire him.

Because Williams has failed to point to any record evidence showing that the defendant's reasons for not promoting him to the data collection technician positions were pretextual, the defendant's motion for summary judgment on the race discrimination claim is granted.

B.      Reassignment

Williams next asserts that he was retaliated against for filing a charge with the EEOC when he was reassigned to Kansas City. A plaintiff may establish a prima facie case of retaliation using either the direct or indirect methods. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). To avoid summary judgment on a retaliation claim under the direct method, Williams must point to evidence from which a jury could conclude that "(1) [he] engaged in activity protected by Title VII; (2) the Postal Service took an adverse employment action against [him]; and (3) there was a causal connection between [his] protected activity and the adverse

9

employment action." *Id.*; *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). Alternatively, he can survive summary judgment under the indirect burden-shifting method if he shows that he: (1) engaged in statutorily protected activity; (2) performed his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than other similarly situated employees who did not engage in protected activity. *Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009). If Williams sets forth a prima facie case of discrimination, the defendant must then articulate a legitimate, nondiscriminatory reason for its decision to terminate him. *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007). If it does so, Williams must then produce evidence supporting an inference that the proffered reason was pretextual. *Id.*

With respect to the direct method, Williams describes at length how several individuals employed by the defendant had knowledge of his EEOC charge. Williams implies that because the reassignment occurred after he filed his EEOC charge, it must have been retaliatory. But, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (citations omitted). "Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Id.* Williams fails to make any such showing and, in any event, absent more, a separation of over two months between his formal EEOC complaint and the notice he was to be reassigned is insufficient temporal proximity to establish causation. *Kodl v. Bd of Educ. of Villa Park*, No. 05 C 3837, 2006 WL 2192014, at *16 (N.D. Ill. Aug. 1, 2006) (finding two-month separation between complaint and transfer insufficient to establish causation). *see Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 666 (7th Cir. 2011) ("The two-month time frame separating Benuzzi's first amended EEOC complaint and her second

suspension is, without more, insufficient to give rise to . . . [an] inference [of retaliation]"). Indeed, as the defendant notes, the same letter regarding possible reassignment was sent to all AMC O'Hare employees. (Def.'s Rule 56.1(a) Stmt., Dkt. # 63, ¶ 27.) "Causality is typically one of the highest hurdles retaliation plaintiffs must clear," *Benuzzi,* 647 F.3d at 665, and Williams fails to do so here.

As to indirect method, even assuming that Williams established a prima facie case of retaliation, he fails to show that the defendant's reason for reassigning him, *i.e*., seniority, was pretextual. While admitting that those who were reassigned to the Chicago facility were senior to him, he contends that the seniority was in "total years only" and that the defendant failed to follow the JCIM in establishing seniority. According to Williams, the defendant used a "maintenance seniority system" as opposed to the "standard rules of occupational group seniority" to award other non-African Americans a custodian position in Chicago instead of transferring them to Kansas City. (Pl.'s Resp., Dkt. # 68, at 13.) In support, he points to the affidavit of Nalaski, the former Vice-President of the APWU Local 7011 and former union steward, who states he assisted Williams in apparently related cases before the EEOC, the National Labor Relations Board, and the Merit Systems Protection Board. (Nalaski Aff, ¶ 1.)

According to Nalaski, the 2007 JCIM governs all "National Agreement article issues" relevant to any employment action directed to Williams in 2010. (*Id*. ¶ 2.) He goes on to attest that "JCIM Article 5 unilateral action prohibits actions such as how the awarding of labor custodian jobs were granted to maintenance employees based on 'maintenance seniority' rather than 'occupational group seniority.' Occupational Group seniority was to receive priority for custodian jobs based on qualifications." (*Id*. ¶ 13.) Although generally challenging the manner in which the defendant determined seniority when reassigning workers from the AMC O'Hare

facility, Nalaski's affidavit fails to address the implications in this case of using maintenance seniority rather than occupational group seniority or whether Williams would have been reassigned using the latter method. While it is true that "an employer's failure to follow its own internal employment procedures *can* constitute evidence of pretext," *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (emphasis added), such an inference is inappropriate here where the same seniority policy was applied across the board to all employees considered for reassignment at the AMC O'Hare facility.

Accordingly, the Court grants the defendant's motion for summary judgment as to the retaliation claim.

### C. Retaliation by Geoffrey Goggins

The defendant also addresses a possible claim of retaliation by Williams against his supervisor Geoffrey Goggins based on statements Williams made in his deposition. Because Williams does not respond to this argument and no separate claim against Goggins is alleged in the amended complaint, the Court concludes that no such claim is alleged and if it was, it has been waived.

### D. Termination

Finally, Williams contends that he was terminated based on "discrimination and retaliation." As an initial matter, the defendant argues that Williams cannot sue for discrimination or retaliation with respect to his departure because he voluntarily resigned by never showing up for his reassigned position in Kansas City. Williams asserts, however, that he was terminated and never resigned. In support, he points to a March 10, 2011 letter from Paul Greenblatt at the USPS stating that he was being "permanently remove[d]" for failing to appear at his reassigned position in Kansas City. (Pl.'s Stmt. Add. Facts, Dkt. # 69-13, Ex. 7.) Williams also submits a letter dated

June 23, 2011, from the Manager of Maintenance Operations, Jeffrey Dumas, which states that "[a]s a result of your previous resignation, this letter is to notify you that the Notice of Removal you received dated February 11, 2011, is hereby rescinded." This issue of fact, however, need not be resolved, because even if he was terminated, Williams fails to point to any evidence that he was terminated based on his race or in retaliation for having filed an EEOC charge.

Indeed, in his response to the defendant's motion for summary judgment, Williams does not discuss race or the EEOC charge in the context of his purported "wrongful termination" and instead appears to argue that he was terminated in violation of the Uniformed Services Employment and Reemployment Act ("USERRA"). The USERRA (1) guarantees veterans a right of reemployment after service, 38 U.S.C. § 4312; (2) sets forth the positions to which veterans are entitled upon their return, 38 U.S.C. § 4313; and (3) prevents employers from discriminating against veterans on account of their service. 38 U.S.C. § 4311. Other than attesting in his affidavit that he is a veteran who was receiving medical treatments from the Veterans Administration, Williams sets forth no facts supporting a claim under the USERRA. Accordingly, any potential USERRA claim is dismissed.

**IV.     Conclusion**

For the reasons stated above, the USPS's motion for summary judgment [61] is granted. The case is terminated and the clerk is directed to enter a Rule 58 judgment.


**Date**: November 27, 2012

_Ronald A. Guzman_
_____
**Ronald A. Guzman**
**United States District Judge**